## AFFIDAVIT OF GREGORY BROWN

I, Detective Gregory Brown, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1. I am a Detective with the Boston Police Department ("BPD") where I have worked for over 30 years. I am currently assigned to BPD's Special Investigations Unit ("SIU"), where I have worked for over 10 years.[1] SIU is a citywide unit made up of Detectives and other investigators who regularly work with units throughout BPD and as sworn Task Force Officers ("TFO") with federal investigative agencies such as the Federal Bureau of Investigation ("FBI") investigating drug, firearm, racketeering and other crimes being committed by street gangs and other criminal organizations operating in and around the City of Boston.

2. During my tenure at BPD, I have been involved in investigations relating to a wide variety of suspected criminal activity, including the illegal distribution of narcotics, firearms-related offenses and violent crimes. Since March 2016, I have participated in joint operations with the FBI investigating drug and firearm trafficking in and around the City of Boston.

3. I have received training in enforcement and investigation of firearm and narcotics cases. I have conducted and participated in investigations involving the violation of both the federal drug and firearms laws, including 18 U.S.C. § 922(g)(1) -- being a felon in possession of a firearm or ammunition, and 21 U.S.C. §§ 841 and 846 -- illegal distribution and possession with

---

[1] Prior to my assignment to SIU, I was an investigator in the Youth Violence Strike Force ("YVSF") from 1995 to 2007 and I was assigned to the Anti-Gang Violence Unit from March 1993 to May 1995. My primary duties as an investigator in these units were to identify Boston based street gangs, document their membership and gather intelligence relative to gang activity. I also worked in partnerships with other law enforcement and community based agencies to initiate procedures to disrupt the organizational structure and reduce the criminal activities of these gangs.

1

intent to distribute controlled substances and conspiracy to distribute and possession with intent to distribute controlled substances.

4.  I have participated in the investigation described in detail below. During it, I have conducted surveillance, provided intelligence and participated in the preparation and debriefing of the cooperating witness used to purchase drugs. I have reviewed reports prepared by other investigators, and discussed individual investigations with other FBI and BPD investigators. Because of my personal participation in these investigations, my conversations with other law enforcement officers, and review of reports prepared by other officers, I am familiar with them. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and accompanying arrest warrant and does not set forth all of my knowledge about this matter.

5.  Based on my training and experience, I know that it is a violation of 21 U.S.C. §§ 841(a)(1) and 846 for a person to conspire with other persons known and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute cocaine, a Schedule II controlled substance, and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance. As set forth below, there is probable cause to believe that from a time unknown, continuing until in or about October 2016, at Boston, and elsewhere in the District of Massachusetts, and at other places presently unknown, Gary Jamal WEBSTER, a/k/a "Jamal," violated 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi) and 846 by conspiring with other persons known and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute cocaine, a Schedule II controlled substance, and 40 grams and more of a mixture and substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-

piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance.

6. In August 2016, a cooperating witness ("CW-1"),[2] informed investigators that CW-1 could purchase controlled substances from "Jamal Webster," who worked for "Michelle Wu at City Hall" and who CW-1 believed handled appeals for people trying to get "marijuana licenses." CW-1 also stated that "Jamal" mostly sells marijuana, but that CW-1 knew him to "make a few plays here or there" and that they had been in contact about cocaine prices. I am aware that CW-1's reference to "makes a few plays here or there" refers to the distribution of cocaine and other narcotics.

7. "Jamal Webster" was later identified as Gary Jamal WEBSTER ("WEBSTER"), date of birth XX/XX/1983, the Director of Constituent Services for Boston City Council President, Michelle Wu. CW-1 later identified a sanitized photograph in the name of "Gary J. Webster," date of birth XX/XX/1983, from the Registry of Motor Vehicles, as the individual CW-1 knew as "Jamal Webster."

8. From September 2016, through October 2016, CW-1 conducted 5 controlled purchases of cocaine and/or fentanyl from WEBSTER. Before each transaction, CW-1 initiated contact by calling or texting WEBSTER on cellular telephone numbers previously provided to CW-1 and negotiated the purchase of the various controlled substance. Whenever possible, these calls and texts were consensually recorded and/or monitored by the FBI. Once the amount of the drugs, the price, and the meet location was established, CW-1's vehicle and person were searched,

---

[2] CW-1 began cooperating with law enforcement in March 2016. CW-1 has a criminal history including arrests for firearms offenses, drug offenses, larceny offenses, and crimes of violence. I consider the information provided by CW-1 to be reliable. CW-1 is cooperating with law enforcement to receive financial compensation.

CW-1 was provided with a transmitter, audio and/or video recording equipment, and Official Advance Funds ("OAF") with which to make drug purchases, and surveilled to the meet location. Whenever possible, conversations that took place during the buys were monitored as they took place using a transmitter. Once the buy was completed, CW-1 was surveilled back to a predetermined meeting location and turned over any purchased drugs or remaining funds, the recording equipment and transmitter, was searched a second time, and debriefed. Drugs obtained were thereafter inspected, field tested when possible, and processed into evidence so that they could be sent to the Northeast Regional Laboratory for further testing.

  A. *September 8, 2016 Controlled Purchase*

  9. On September 4, 2016, CW-1 called (617) 291-8524 (the "WEBSTER Phone #1") and had a conversation with WEBSTER, during which WEBSTER quoted CW-1 a price of $3,000 for 62 grams of cocaine. WEBSTER also told CW-1 that he would have the cocaine on Thursday at his home address. This call was not recorded.

  10. On September 8, 2016, at approximately 3:46 p.m., CW-1 received a call from WEBSTER over the WEBSTER Phone #1. WEBSTER instructed CW-1 to meet him at 7:00 p.m. at his father's house in Dorchester. CW-1 knew WEBSTER's father lived at 66 Codman Hill Avenue in Dorchester, Massachusetts ("66 Codman Hill").

  11. At approximately 6:50 p.m., CW-1 went to 66 Codman Hill to meet WEBSTER. Once at the residence, CW-1 greeted WEBSTER, who was seated in the driver's seat of a black Jeep Grand Cherokee bearing Massachusetts registration 1PYC40 ("the Jeep"). CW-1 then entered the passenger seat of the Jeep and WEBSTER drove out of the area. During the drive, WEBSTER handed CW-1 a package of cocaine. CW-1 handed WEBSTER $3,000 in OAF.

4

CW-1 asked WEBSTER how quickly WEBSTER could get more cocaine and how much WEBSTER would charge for a kilogram of cocaine. WEBSTER stated that he did not know the price but would find out. Moments later, WEBSTER dropped CW-1 off and continued out of the area in the Jeep.

12. CW-1 proceeded to a predetermined location and turned over one plastic baggie containing a second plastic baggie that contained suspected cocaine. Testing at the New England Field Division laboratory revealed the substance contained cocaine hydrochloride and weighed 62.2 grams. A review of the video taken during the controlled buy shows WEBSTER.

    B. *September 22, 2016 Controlled Purchase*

13. On September 19, 2016, CW-1 called the WEBSTER Phone #1 and had a conversation with WEBSTER, during which WEBSTER and CW-1 agreed that WEBSTER would sell CW-1 62 grams of cocaine for $3,000 on Wednesday, September 21, 2016. This call was not recorded.

14. On September 22, 2016, at 5:04 p.m., CW-1 sent a text message to WEBSTER on the WEBSTER Phone #1 asking, "Hey what time can we get together where and when?" At 5:46 p.m., WEBSTER responded via text message from the WEBSTER Phone #1, "Around 9 same spot I'll hit you up." CW-1 and WEBSTER exchanged several additional text messages over the WEBSTER Phone #1 confirming the meeting.

15. Approximately 8:52 p.m., CW-1 went to 66 Codman Hill to meet WEBSTER. At approximately 9:31 p.m., WEBSTER arrived at 66 Codman Hill in a Mercedes-Benz sedan, bearing Massachusetts registration GJW1, and parked in the driveway. WEBSTER invited CW-1 to accompany him inside 66 Codman Hill. WEBSTER used a key to access an exterior door that

provided direct entry to the basement. Once in the basement, WEBSTER stated to CW-1, "I'm not trying to ignore you or nothing, I gotta get a new phone," and "I just need to get another phone, I need a separate jack," and "I don't like saying or talking on this phone." CW-1 handed WEBSTER $3,000 in OAF. Moments later an individual later identified as Jonathan Andrade walked into the basement using an interior staircase.

16.    CW-1 asked, "What's up with the smoke?" to which WEBSTER replied, "I got that, well I think Jonathan's got some sour." I know that CW-1's statement regarding "the smoke" and WEBSTER's statement regarding "sour" are references to marijuana. CW-1 later said, "you know what um I really want is some motherfucking um, some motherfucking deez (phonetic) man. Yeah. That's the boom, this coke shit is whack man," and "what's up with the deez (phonetic), no?" I know that CW-1's statement regarding "the deez" is a reference to "diesel" or heroin. Andrade replied, "Yeah, that's fine," and later, "you ever fuck with the fentanyl out here? That's kinda what it really is now, at least out my way. Like anybody who used to sell brown or was selling brown, they can't move it now cause everyone wants fentanyl. Because what they're doing with the fentanyl is turning one into... you know what I'm saying, you know they're killing it." CW-1 responded, "That shit's dangerous though man." Andrade replied, "Yeah, but it's all dangerous." I know that Andrade's statements regarding "the brown" are a reference to heroin.

17.    Andrade then handed WEBSTER a bag of cocaine and marijuana and WEBSTER removed the marijuana. WEBSTER then passed the bag of cocaine to CW-1. CW-1 asked, "so, when's the next time I can see you man?" WEBSTER responded, "whenever." Andrade then stated, "tomorrow, the day after, any day, it's just tomorrow's busy sometimes, we could always make it happen though." Later, CW-1 asked WEBSTER, "so what's the numbers on the bud, on

the best, best bud you got? The best bud you got? What's the numbers?" WEBSTER replied, "I mean this is all I got." CW-1 said, "no, the best, what's the numbers on the best bud you can get? You don't know what the numbers would be until you get it?" WEBSTER said, "I mean nothing should be over, I mean nothing should be over like 33, 31, like that at the most. Usually it's like, for shit like this… 28." I also know that CW-1 and WEBSTER were referring to marijuana and that WEBSTER was quoting a price between $2,800 and $3,300 for a pound of marijuana. WEBSTER then added, "my problem is my man's got a nice connect in Cali but I don't want, I don't want him to send me nothing. Cause I don't trust that shit. But if I had a way to get it, it's bomb and it's good numbers." CW-1 then asked, "so, what's up, what's up with the dope man? Like, like, what's the numbers on it? If I wanted to get like 100 grams?" I know that CW-1 was asking for the price of 100 grams of heroin. Andrade replied, "Basically, I could adjust it, I could adjust it anyway that you, like if you want that… then I have to let you know cause I don't, I haven't been grabbing the regular dope, I've been grabbing the fentanyl." Andrade then added, "Everyone got their own little recipe man but, this shit, they be hitting it like five on one and it still be gassing. Everyone at first is like hesitant because they feel the same way you know but then when the people start using it that's all they want." I know that Andrade was referencing that fentanyl dealers are cutting fentanyl up to five times and that the resulting product is still potent. CW-1 then asked, "so man, when can I hit you again man?" WEBSTER responded, "Whenever you're done." Andrade said, "The only time I have a problem is if we O-T (out of town) or something." CW-1 then exited the basement.

18. CW-1 departed 66 Codman Hill at approximately 9:41 p.m., proceeded to a predetermined location, and turned over one plastic baggie containing a second plastic baggie that

contained suspected cocaine. Testing at the New England Field Division laboratory revealed the substance contained cocaine hydrochloride and weighed 60.7 grams. The video taken during the controlled buy shows WEBSTER.

    C.    *September 29, 2016 Controlled Purchase*

19.    On September 29, 2016, CW-1 exchanged text messages with WEBSTER on the WEBSTER Phone #1, agreeing to meet at 8:15 p.m. at 66 Codman Hill to purchase 62 grams of cocaine for $3,000.

20.    An Uber pull up to 66 Codman Hill and WEBSTER get out and meet with CW-1 at approximately 8:16 p.m. WEBSTER and CW-1 walked to the back porch of 66 Codman Hill, during which time WEBSTER provided the drugs in exchange for $3000. WEBSTER and CW-1 discussed prices for a potential heroin transaction.

21.    CW-1 departed 66 Codman Hill, proceeded back to a predetermined location, and turned over one plastic baggie containing a second plastic baggie that contained suspected cocaine. Testing at the New England Field Division laboratory revealed the substance contained cocaine hydrochloride and weighed 62.0 grams.

    D.    *October 6, 2016 Controlled Purchase*

22.    On October 6, 2016, CW-1 advised agents that CW-1 communicated with WEBSTER over the WEBSTER Phone #1 and agreed to purchase 125 grams of cocaine for $6,000. WEBSTER instructed CW-1 via text message to meet him at approximately 8:00 p.m. that night at 66 Codman Hill.

23.    CW-1 arrived at 66 Codman Hill at approximately 8:10 p.m., made a phone call to WEBSTER, and entered the basement. CW-1 sat at a table in the basement and WEBSTER

handed CW-1 a brown plastic shopping bag containing the cocaine in exchange for the $6,000 in OAF. CW-1 and WEBSTER discussed potential future transactions concerning heroin when Andrade returned to town.

24. CW-1 exited the basement of 66 Codman Hill at approximately 8:33 p.m., proceeded to the predetermined meeting location, and turned over one the shopping bag containing the suspected cocaine. Testing at the New England Field Division laboratory revealed the substance contained cocaine hydrochloride and weighed 123.6 grams.

### E.  October 18, 2016 Controlled Purchase

25. Between October 12, 2016 and October 17, 2016, WEBSTER and CW-1 exchanged approximately nine text messages to arrange the sale of 50 grams of heroin for $4,000. WEBSTER utilized the WEBSTER Phone #1 for all of these electronic communications.

26. On October 18, 2016, at approximately 3:00 p.m., WEBSTER, utilizing telephone number (617)888-9971 (the "WEBSTER Phone #2"), called CW-1. During the call, WEBSTER told CW-1 that he would get up with "J" and get with CW-1 around 10:30 p.m.

27. On October 18, 2016, at approximately 10:12 p.m. CW-1 went to 66 Codman Hill to meet WEBSTER. At approximately 10:46 p.m., CW-1 entered the basement of 66 Codman Hill and met with WEBSTER and Andrade. Once in the basement, CW-1 was alone with Andrade. CW-1 stated, "Let's get this out the way, here you go," and attempted to hand Andrade $4,000 in OAF. Andrade told CW-1 to give the money to WEBSTER. WEBSTER then entered the basement. CW-1 handed WEBSTER $4,000 in OAF and stated, "Here you go J-ski." WEBSTER asked Andrade, "You gave him that?" To which Andrade replied, "Nah, I didn't give him nothing." WEBSTER then stated to CW-1, "yeah, that, um, you wanted…" and CW-1

responded, "yeah, yeah." WEBSTER stated, "Twenty, you got the twenty." Andrade stated, "It's in that bag, I had it in…" WEBSTER interrupted, "oh, it's in the bag you gave me?" Andrade responded, "Yeah." WEBSTER then handed CW-1 a bag of suspected heroin. CW-1 later stated, "So, um, I might need to see you, um, on the flav tip man, I might need to see you, ah, fucking um, I might need to see you… What's your, what's your schedule look like Thursday Mal? Or Friday? Or it could be during the day like you said? That, that works. How that work for you?" I know that CW-1 statements regarding "the flav" is a reference to cocaine. I know this based on my training and experience in this and other investigations. WEBSTER responded, "um, depends on the day." CW-1 asked, "what's the better day?" WEBSTER stated, "I don't know right now… you said Thursday? Meaning this, this Thursday?" CW-1 stated, "anything that's good for you is great for me." WEBSTER responded, "every day is day by day for me man. I legit got a calendar and shit." CW-1 and Andrade engaged in a conversation about future drug deals and CW-1 then exited the basement.

28. CW-1 depart 66 Codman Hill at approximately 10:59 p.m., proceeded to a predetermined location, and turned over one plastic baggie containing a substance that contained suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained fentanyl, acetylfentanyl, and caffeine, and weighed 49.1 grams. The video taken during the controlled buy shows both Andrade and WEBSTER.

29. Based on the above, I believe probable cause exists to believe that from a time unknown, continuing until in or about October 2016, at Boston, and elsewhere in the District of Massachusetts, and at other places presently unknown, Gary Jamal WEBSTER, a/k/a "Jamal," violated 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi) and 846 by conspiring with other persons known

and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute cocaine, a Schedule II controlled substance, and 40 grams and more of a mixture and substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance

_____
Detective Gregory Brown
Boston Police Department,
Special Investigations Unit

Subscribed and sworn to before me this **Aug 22, 2018** nd day of August 2018.

_____
HON. JUDITH G. DEIN
UNITED STATES ~~MAGISTRADTE~~ JUDGE
Magistrate

11